**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| JAMES GHAISAR and KELARA GHAISAR, Individually and as Personal Representatives and Co-Administrators of the Estate of BIJAN C. GHAISAR, Deceased | Civil Action No. _____ |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA | |
| Defendant. | |

## COMPLAINT

James and Kelara Ghaisar (together, the "Ghaisar family" or "Plaintiffs"), by and through their attorneys, bring this Complaint in their official and individual capacities, against the UNITED STATES OF AMERICA ("UNITED STATES") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680 and 28 U.S.C. § 1346(b)(1).

The Ghaisar family alleges as follows:

### INTRODUCTION

1.     This wrongful death and civil rights case is about the egregious, senseless, and unlawful killing of a young man by two out-of-control law enforcement officers, and racial and religious profiling by law enforcement officers.

2.     On November 17, 2017, two United States Park Police officers—Alejandro Amaya ("Amaya") and Lucas Vinyard ("Vinyard")—repeatedly shot Bijan C. Ghaisar ("Bijan"), a twenty-five-year-old accountant from McLean, Virginia, through the window of his vehicle as he sat, passive and unarmed, behind the wheel.

3.      Bijan had driven away from a fender-bender that occurred on the southbound lane of the George Washington Memorial Parkway, in which *his* vehicle was the one struck, and where there was little property damage and no known injuries.

4.      Following that minor traffic accident, a Park Police cruiser with two officers inside—Amaya and Vinyard—began pursuing Bijan.  A Fairfax County, Virginia police officer (the "Fairfax Officer") joined the pursuit and turned on his dashboard video camera.  When the Fairfax Department of Public Safety Communications ("Fairfax Dispatch") requested to know the Park Police charges on the vehicle being pursued, Park Police informed Fairfax Dispatch that the charges on Bijan were for "fleeing from the scene of an accident at this point."

5.      The footage from the Fairfax Officer's dashboard video camera, released in January 2018 by Fairfax County Police Chief Edwin C. Roessler ("Chief Roessler"), shows that Bijan drove at a reasonable rate of speed while being followed.  He did not swerve or put anyone in danger and, despite his obvious duress, even continued to use his indicator when turning or switching lanes.

6.      Bijan stopped on three different occasions while being followed.  Each time, either Amaya or Vinyard, or both, leaped from their patrol car, raced to Bijan's Jeep, and pointed a gun at his head through the driver side window.

7.      The first two times—presumably terrified of the overly aggressive officers—Bijan carefully and slowly drove away from their brandished weapons.

8.      At the third and final stop, Bijan came to a complete stop at a stop sign in the Fort Hunt area of Fairfax County, Virginia.  Amaya and Vinyard then blocked Bijan's Jeep with their patrol car, and again jumped out of it to confront him with guns drawn.

9.     Amaya and Vinyard fired nine times into the Jeep, mostly from close range, as Bijan sat behind the wheel, unarmed.

10.     Their bullets struck Bijan in the left side of his head and in his right wrist.  Three of the bullets remained lodged in Bijan's skull.

11.     At no time did Bijan pose a threat to anyone.  Amaya and Vinyard, however, violated the Constitution and Park Police policy and training both in pursuing Bijan and in using force against him.

12.     At the hospital, Bijan remained in a coma until his death.  Other federal law enforcement officers, whose identities have not been revealed to the Plaintiffs, maintained that he was "under arrest," and restricted the Ghaisar family's ability to make medical decisions on his behalf or even to touch their son.

13.     After multiple doctors told the family that Bijan would never regain consciousness and would slowly die of organ failure, the Ghaisar family made the heart-wrenching decision to remove all life-sustaining equipment.

14.     Bijan persevered—notwithstanding his horrific injuries—for ten days after Amaya and Vinyard shot him.

15.     On November 27, 2017, Bijan Ghaisar died at Inova Fairfax Hospital at 3300 Gallows Road, Falls Church, Virginia 22042—the same hospital where he was born.

16.     It has been more than 670 days since Amaya and Vinyard shot Bijan, a bright, positive, and passionate young man who believed in candor, in justice, and in peace.  To date, the federal government has released virtually no information to Bijan's family about the shooting.

17.     After twenty-two months, no federal, state, or local government official has explained to Bijan's family why Amaya and Vinyard frantically pursued Bijan down the George

Washington Memorial Parkway and into Fairfax, Virginia after he drove away from a minor rear-end accident—again, involving no known injuries and little property damage—in which *he* was the victim.

18.     After twenty-two months, no federal, state, or local government official has explained to Bijan's family why Amaya and Vinyard approached Bijan's car with weapons drawn and aimed at his head.

19.     After twenty-two months, no federal, state, or local government official has ever explained to the family why Bijan was "under arrest" and could not be touched for most of his time in the hospital.

20.     Most importantly, after twenty-two months, no federal, state, or local government official has ever explained to the Ghaisar family the reasons Amaya and Vinyard fired nine times into Bijan's Jeep as he sat behind the wheel, unarmed, in the early evening of November 17, 2017.

21.     Twenty-two months is too long for any grieving family to live without any explanation about why law enforcement officers shot and killed their son while authorities sit on relevant information.

22.     For months, no federal, state, or local government official would even identify the officers involved in the shooting, even though virtually every law enforcement agency now does so shortly after a shooting.  However, in March 2019, in response to a subpoena from the Plaintiffs in support of their *Bivens* claim filed in October 2018, the Fairfax County Police Department produced documents indicating that Alejandro Amaya and Lucas Vinyard were the two officers who shot Bijan while he sat, passive and unarmed, in his car.  The Commander of the Office of Professional Responsibility for the Park Police confirmed the identification of Amaya and Vinyard as the shooters.

23.     James and Kelara Ghaisar bring this action, individually and in their official capacity as co-administrators and personal representatives of the Estate of Bijan Ghaisar, to vindicate Bijan's statutory and constitutional rights to be free from arbitrary and deadly force. They seek a declaration that the government violated his rights.  They also seek an appropriate amount of monetary damages for their harrowing and wholly unnecessary grief.  The Defendant is the UNITED STATES.

## JURISDICTION AND VENUE

24.     This action is brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680 and 28 U.S.C. § 1346(b)(1), and Va. Code Ann. § 8.01-25 and §§ 8.01-50–8.01-56.

25.     This Court has jurisdiction under 28 U.S.C. § 1331.

26.     This Court also has exclusive jurisdiction over the FTCA claims in this action pursuant to 28 U.S.C. § 1346(b) because Plaintiffs allege tort claims against the United States for the acts of its employees.  The precise claims at issue are "claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

27.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1402(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

28.      On February 24, 2019, pursuant to 28 U.S.C. § 2675(a), Plaintiffs presented written notice, specifically a completed Standard Form 95 together with an addendum and all pertinent supportive documents, of their administrative tort claim to the appropriate federal agencies, the Department of the Interior ("DOI"), and the United States Park Police, through Plaintiffs' legal representative. *See* Attached Composite Exhibit A.

29.      An Attorney-Advisor in the Department of the Interior's Office of the Solicitor provided written notice confirming receipt of Plaintiffs' administrative claims on February 25, 2019. *See* Attached Exhibit B.

30.      On August 27, 2019 the Department of the Interior issued a response to the claims. The response, which is attached hereto as Composite Exhibit C, stated that "the Department of the Interior cannot render a disposition on [the] claim" and advised that Plaintiffs may "file suit in an appropriate United States District Court."   The Ghaisar family has thus exhausted their administrative remedies for purposes of their claims under the FTCA.  *See* 28 U.S.C. §§ 2675, 1346.

31.      Consistent with 28 U.S.C. § 2401(b), Plaintiffs are commencing this action within six months of the government's refusal to render a disposition on their claims.

## PROCEDURAL HISTORY

32.      On October 16, 2018, Plaintiffs filed a Complaint (the "October 2018 Complaint") against the United States and against John Does 1-10.  At the time they filed the October 2018 Complaint, Plaintiffs did not yet know the names of the shooting Park Police officers because the government was withholding that information.

33.     Counts I through V of the October 2018 Complaint were against the United States. Count VI of the October 2018 Complaint was against John Does 1-10.

34.     On January 30, 2019 this Court dismissed Counts I though V against the United States, without prejudice.  The Court did not dismiss Count VI against John Does 1-10.

35.     On February 27, 2019 Plaintiffs filed an *ex parte* motion for expedited discovery, for the limited purpose of identifying the true names of John Does 1-10 so that Plaintiffs could serve them with the October 2018 Complaint, now consisting of only Count VI against John Does 1-10.  The Court granted Plaintiffs' motion in part on February 28, 2019.

36.     On March 12, 2019 in response to Plaintiffs' request pursuant to *United States ex rel. Touhy v. Regan*, 340 U.S. 462 (1951), The Commander of the Office of Professional Responsibility for the Park Police finally identified Alejandro Amaya and Lucas Vinyard as the Park Police officers who shot and killed Bijan.  The Commander refused, however, to reveal the names of the other United States government officers and officials involved in the facts set forth in the October 2018 Complaint and this Complaint.  Plaintiffs therefore are still unaware of the true identities of those individuals.

37.     Plaintiffs amended their October 2018 Complaint to name Amaya and Vinyard and served them with that complaint on March 29, 2019.  Vinyard and Amaya answered the October 2018 Complaint on June 26 and 27, respectively.  That case, Civil Action No. 1:18-cv-1296, remains pending against Amaya and Vinyard, and against JOHN DOES 3-10.  Plaintiffs will amend their October 2018 Complaint to allege the remaining DOE Defendants' true names and capacities when the United States ceases to withhold them, as it ultimately must.

## APPLICABLE SUBSTANTIVE LAW

38.     The substantive law of the State of Virginia governs the Ghaisar family's FTCA claims under 28 U.S.C. § 1346(b)(1) because the Park Police officers' unlawful conduct occurred in Virginia.

## JURY DEMAND

39.     Plaintiffs demand a trial by jury in this action for each of their claims triable to a jury.

## PARTIES

40.     At all times material to the events set forth in this Amended Complaint, Plaintiff JAMES GHAISAR has been a resident of the Eastern District of Virginia.  He is a United States citizen currently residing in McLean, Virginia.

41.     Plaintiff James Ghaisar is Bijan's father and is a personal representative and co-administrator of the Estate of Bijan Ghaisar.  *See* Attached Exhibit D.

42.     At all times material to the events set forth in this Amended Complaint, Plaintiff KELARA "KELLY" GHAISAR has been a resident of the Eastern District of Virginia.  She is a United States citizen currently residing in McLean, Virginia.

43.     Plaintiff Kelly Ghaisar is Bijan's mother and is a personal representative and co-administrator of the Estate of Bijan Ghaisar.  *See* Attached Exhibit D.

44.     The deceased, Bijan, is not survived by a spouse or children.

45.     According to Bijan's death certificate, he died on November 27, 2017.  The coroner listed the manner of death as "homicide."

46.     Defendant UNITED STATES is sued under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 and 28 U.S.C. § 1346, for the tortious acts of its employees.

## FACTS

### A. Bijan C. Ghaisar was a fun-loving, gun-hating, sports-crazy young man

47.     At the time he was shot and killed by the Park Police, Bijan was twenty-five years old.  He was two years out of college, worked as an accountant, and lived in an apartment in McLean, Virginia near his parents' home.

48.     Bijan's parents, James and Kelly Ghaisar, both grew up in Iran and immigrated to the United States in the 1970s.  Both became citizens of the United States.

49.     Kelly's father was the police chief in Shiraz, Iran, and a colonel in Tehran.  For this reason, Bijan grew up with deep respect for law enforcement.

50.     James and Kelly were married in 1986.  Their daughter, Negeen Ghaisar, was born in 1988, and Bijan was born in 1992.  After living in Vienna, Virginia for several years, the family moved to McLean, where James operated his own accounting practice.  Kelly worked as a makeup artist and as an interior designer, and also sold real estate.

51.     Bijan was a young man of many passions, including chicken wings and video games.  Like many Americans, he also loved professional football.  Bijan was nine years old at the time of the 9/11 terrorist attacks.  After watching the New England Patriots win the Super Bowl that season, Bijan told his family that the Patriots were his favorite team for inspiring hope again in America.  Bijan named his dog Bruschi, after former Patriots' linebacker Tedy Bruschi.

52.     At Langley High School, Bijan played both football and lacrosse.  Although he was not particularly big or athletic, he worked very hard for playing time.  He graduated from high school in 2010.

53.     For college, Bijan and several friends chose the University of Alabama, not far from where Bijan's father had earned his MBA with a specialization in accounting at the University of

South Alabama.  But Bijan found it to be too far from home and family.  After a devastating weather event in Alabama his freshman year, Bijan made the decision to transfer closer to home, to Virginia Commonwealth University ("VCU").

54.     Bijan was beloved by his friends.  Classmates and fraternity brothers from VCU describe him as a goofy and jovial friend; a real pleasure to be around.  Childhood friends remember him as fun-loving, comforting, and considerate.

55.     Bijan graduated from VCU with an accounting degree in 2015 and began working for his father's accounting practice.  He lived in an apartment in a Fairfax County high-rise.

56.     Professionally, Bijan aspired to do something to make this world better.  He often expressed this hope to his family.

57.     Bijan hated very few things, but one thing he hated was guns.  He advocated for peace and nonviolence.  After the mass shooting at a movie theatre in Aurora, Colorado, in 2012, Bijan took to Facebook to say it was upsetting and unacceptable that America had not embraced gun control.

58.     On the day he was shot and killed, Bijan ate lunch at his parents' house, and then took a walk with his mother.  This was the last time Kelly saw Bijan.

59.     That evening, Bijan had plans to have dinner with his father at 8 p.m.  But, Bijan never showed up.

**B.  An Uber driver rear-ends Bijan right before Park Police aggressively pursue him**

60.     In the early evening of November 17, 2017, Bijan was driving on the George Washington Memorial Parkway (the "Parkway").  His vehicle was a Jeep ("Jeep") with a vanity license plate that read "BIJAN."

61.     Bijan stopped his Jeep and was struck from behind by an Uber driver in a Toyota Corolla.

62.     According to the Department of the Interior Investigator's Traffic Crash Report, this minor traffic collision happened at about 7:31 p.m.  The rear-end collision happened on the southbound side of the Parkway just north of Alexandria, Virginia.

63.     According to this report, which is for unknown reasons dated December 1, 2017 (fourteen days after the crash date), Park Police Officer Anthony McSherry investigated the crash "at the scene," and determined the crash was not a "hit and run."  He also marked that it did not cause any "non-motor-vehicle property damage."

64.     Park Police Officer McSherry cited the Uber driver for the accident because he failed to maintain proper control, a standard charge for a rear-end collision.

65.     The Park Police's report also said the amount of damage to the Jeep was "unknown," even though Park Police could have easily determined this since police had towed the Jeep to their seizure lot long before the date that the report was issued.  Authorities have refused to give the family any access to the Jeep or Bijan's personal belongings therein including his cellphone, wallet, clothing, or music.

66.     Upon information and belief, Bijan's Jeep did not sustain any damage.  There is no evidence that anyone was injured and, again, the Park Police report states that no one was.

67.     Bijan reportedly drove away from the scene without exchanging information with the Uber driver.

68.     Upon information and belief, the Uber driver (and perhaps also his passenger) dialed 911.  Upon information and belief, either the Uber driver or his passenger saw Bijan's license plate and reported "BIJAN" to the police.  Upon information and belief, either the Uber

driver or his passenger reported that the Jeep had tinted windows.  Upon information and belief, Bijan had never tinted any of the Jeep's windows.

### C.  Without putting anyone in danger, Bijan, who had no criminal record, was trying to get to safety and away from out-of-control officers who were chasing him

69.     Several minutes after the traffic accident, a marked Park Police cruiser with two officers inside—Amaya and Vinyard—began following Bijan's Jeep heading south on the Parkway, which is maintained by the National Park Service.

70.     At approximately 7:37 p.m., the Fairfax Officer joined Amaya and Vinyard's pursuit.  Video footage of the incident comes from the Fairfax Officer's dashboard video camera. Video footage of the pursuit, and the events following the shooting, was also captured by dashboard video cameras for Fairfax County police vehicles that arrived during and after the shooting.

71.     Amaya and Vinyard did not have vehicular or body-worn cameras.

72.     The footage from the Fairfax Officer's camera shows Bijan stopped three times during the pursuit.

73.     Each time—including the very first time, with absolutely no apparent reason to be aggressive—the Park Police patrol car pulled close to the Jeep, and Amaya or Vinyard, or both, leaped from their car and ran to the Jeep brandishing weapons.

74.     Each time, Amaya or Vinyard, or both, pointed a gun toward Bijan's head.

75.     Each time, at least one of them was close enough to touch Bijan's vehicle, but neither officer was ever in the Jeep's path or in harm's way.

76.     Most likely out of mortal fear of the overly aggressive officers with their guns drawn on him, Bijan slowly and carefully drove off the first and second times that Amaya and Vinyard pulled him over.

77.     Park Police have jurisdiction over the Parkway.  Park Police policy on pursuing vehicles states that officers are authorized to pursue a vehicle only when the driver is suspected of a felony, or presents a clear and immediate threat to public safety, and also states that "[t]he act of fleeing and eluding the police shall not in itself be a pursuable offense."  General Order on Vehicular Pursuits:  Number 2205, 2205.01 (B) (June 8, 2018).

78.     During the pursuit, Bijan appeared to be driving at a reasonable rate of speed and is not observed swerving, driving erratically, or otherwise placing anyone in danger.  The Fairfax Officer stated that "the speed of the pursuit was between 50-60 miles per hour," that Bijan's driving behavior was "normal" and that his driving speed "never became excessive or dangerous."

79.     The Fairfax Officer reported that during the pursuit, traffic was "light" and the weather conditions were "clear."  And, the officer reported that the pursuit "wasn't a high-speed pursuit," and that Bijan wasn't attempting to flee.  The Park Police evidently agreed, having already informed Fairfax Dispatch, when requesting assistance with the pursuit, that "speed is 59 miles per hour.  Traffic's clear."

80.     At the time he was repeatedly shot and killed by Amaya and Vinyard, Bijan had no criminal record.

   **a.  *Bijan's First Stop***

81.     Much of the Parkway where Bijan drove does not have a shoulder on the side of the road for cars to pull over.

82.     At 7:38 p.m., Bijan stopped in the right-lane of the Parkway when the marked Park Police patrol car pulled alongside the Jeep, and one of the Park Police officers leaped from his car and ran to the Jeep.

83.     Either Amaya or Vinyard approached Bijan's window with a gun pointed toward Bijan's head.

84.     This same Park Police officer aggressively jerked Bijan's car door handle in an attempt to open his door.

85.     Bijan slowly drove off.

86.     This Park Police officer slammed his gun into the driver-side window of Bijan's Jeep and dropped something to the ground.

87.     The Fairfax Officer pulled out to follow Bijan's Jeep, but the aggressive Park Police car soon passed the Fairfax Officer.

**b.  *Bijan's Second Stop***

88.     At 7:40 p.m., Bijan used his right-turn signal to pull off the Parkway at the West Boulevard Drive exit.  Bijan again stopped in the road.

89.     Amaya and Vinyard parked their patrol unit slightly in front of Bijan's Jeep and one of them ran to his window.  Again, at least one officer had his gun drawn.  And, again, Bijan drove off slowly and carefully around the Park Police car while one of the officers kicked the side of Bijan's Jeep.

90.     Bijan drove a short distance from West Boulevard Drive to Alexandria Avenue and then headed toward Fort Hunt Road with the Park Police and Fairfax patrol cars behind him.

**c.  *Bijan's Third Stop***

91.     At 7:41 p.m., at the intersection of Fort Hunt Road and Alexandria Avenue, in a residential neighborhood in the Fort Hunt area of Virginia, Bijan stopped a third time.

92.     Bijan stopped at the stop sign, in his lane.

93.     Amaya and Vinyard pulled their patrol car in front of Bijan's Jeep.

94.     As Amaya and Vinyard rushed to Bijan's car, again with guns drawn, the Jeep appeared to roll forward slightly and to the right, away from the officers on the left.

95.     The video does not show any officers, or anyone else, in any danger of the Jeep striking them.

96.     Bijan's window remained closed.

97.     Amaya and Vinyard were within close range of Bijan, as he sat unarmed behind the wheel of his Jeep, when they fired[1] nine shots into his vehicle.

98.     Starting at 7:41:33 p.m., Amaya and Vinyard first fired five shots at Bijan.  Then they paused.

99.     Then at 7:41:42 p.m., Amaya and Vinyard fired two more shots.  Then they paused.

100.     The Jeep stopped moving entirely.

101.     Amaya and Vinyard moved closer, and after twelve seconds, the Jeep again began rolling toward the ditch on the side of Alexandria Avenue, still moving away from the officers. There was no curb or sidewalk on the ditch side of the road.  It appeared as if Bijan's foot had slipped off the brake but was not on the gas pedal because the vehicle was rolling slowly toward the ditch.

102.     At 7:41:57 p.m., either Amaya or Vinyard, who had holstered his pistol, unholstered it.

103.     Amaya and Vinyard fired two more shots at close range.

104.     There was no threat to either Amaya or Vinyard or anyone else at the time of these repeated volleys of shots.

105.     Each and every gunshot constituted an unnecessary and unreasonable use of force.

---

[1] Plaintiffs do not know, and the government has not revealed, which of the nine shots were fired by Vinyard and which were fired by Amaya.  Plaintiffs therefore refer to the shots as fired by both officers.

106.    No other officers at the scene fired any shots.

107.    The Jeep continued slowly toward the ditch and pitched gently to its side, contacting the stop sign, where it again stopped.

**D. The officers who fatally shot Bijan violated the United States Constitution and Park Police policies and training in pursuing him and using force against him**

108.    Amaya and Vinyard repeatedly and intentionally violated the United States Constitution as well as Park Police policies and training by their behavior following this minor traffic accident, including, but not limited to:  chasing an individual; chasing a vehicle into another jurisdiction; parking their vehicle alongside a vehicle they had stopped; aggressively approaching a stopped vehicle at a run; unholstering their firearms; pointing their firearms at another person; using a firearm to strike a vehicle; kicking a vehicle; using deadly force initially; and using deadly force continually and repeatedly over an extended period of time with no provocation or justification.

**a.  *General Order on Vehicular Pursuits:  Number 2205 ("Order 2205")***

109.    Order 2205 states that "[a]s soon as practical, the pursuit shall be relinquished to police units of the entered jurisdiction."  2205.04 (B)(4).

110.    The Park Police officers chasing Bijan neither relinquished nor even attempted to relinquish their pursuit to Fairfax County officers, including the one driving right behind them, even though they had left the Parkway.

**b.  *General Order on Use of Force:  Number 3615 ("Order 3615")***

111.    Order 3615 (dated September 28, 1998) instructs Park Police officers to use "reasonable forms of verbal commands, including volume and tone control" to "avoid having to escalate to a higher level of force."  3615.03 (A).

112.    Here, Park Police officers did not use reasonable forms of verbal commands in approaching Bijan.  Rather, they immediately escalated to a higher level of force in opting to park alongside Bijan, unholster their guns, aim their guns toward Bijan's head, and bang their guns on his window.

113.    Order 3615 also states that deadly force is permissible "only when necessary, that is when the officer has a reasonable belief, in light of the facts and circumstances confronting the officer, that the subject of such force poses an *imminent danger of death or serious bodily harm to the officer or to another person*."  3615.03 (C)(1) (emphasis added).

114.    There is no basis to believe that the officers reasonably perceived any imminent danger "of death or serious bodily harm" to themselves or another person.  In fact, by approaching Bijan as aggressively and recklessly as they did in this situation, they made clear that they did not perceive any danger of death or bodily harm.  Thus, the officers' decision to aggressively pursue Bijan and use excessive force to seize him is unjustified and unlawful.

115.    Order 3615 clarifies that "[o]fficers shall not fire at a moving vehicle . . . except when the officer has a reasonable belief that the subject poses an *imminent danger of death or serious physical injury to the officer or to another person*."  3615.03 (C)(3)(a) (emphasis added).

116.    To the extent that Bijan's vehicle was moving at any time when the Park Police officers shot at Bijan, their actions violated Order 3615.

117.    Amaya and Vinyard jeopardized Bijan's safety and the public's safety when they fired nine shots into his car at an intersection of a residential neighborhood.

**E.  At some point after Amaya and Vinyard shot Bijan four times in the head at close range, the Park Police placed him "under arrest" for no known reason**

118.    Bijan urgently required immediate medical attention after the shooting.  The Fairfax Officer noted, after Bijan was removed from the Jeep, the extreme seriousness of his injuries.

Among other things, the Fairfax Officer noted "a brain injury, the brain was coming out the side of his head . . . brain was exiting his skull."

119.     Around five minutes after Amaya and Vinyard fired their final shot, Fairfax officers on the scene removed Bijan from the Jeep.  A Fairfax officer on the scene requested emergency medical services and relayed to Fairfax Dispatch the urgency of the need for rescue services.  Five minutes later, when emergency medical services still had not arrived, the same Fairfax officer asked Fairfax Dispatch to "have rescue units step it up."  A Park Police dispatcher, when relaying the request, "now we need EMS" to the Fairfax dispatcher, stated in apparent disbelief:  "This is a clusterfuck."

120.     According to the dashboard video cameras of Fairfax officers at the scene, an ambulance from Alexandria arrived fifteen minutes after the shooting.  The ambulance transported Bijan to Inova Fairfax Hospital ("Inova Hospital"), the same hospital where he was born.

121.     Any unnecessary delay in providing Bijan with medical assistance after he was shot constitutes deliberate indifference to his medical needs and is a deprivation of his rights in violation of the Constitution.

122.     The on-call detective for the Fairfax County Police Homicide Unit arrived at the scene and was advised by Park Police personnel that he would receive a walkthrough after the scene was processed.  The Fairfax detective never received the promised walkthrough.  Despite leaving two business cards with the Park Police personnel and offering them his assistance, the Fairfax detective was never contacted by Park Police.

   **a.** ***Park Police representatives waited five hours before notifying the Ghaisar family that Bijan had been critically wounded***

123.     After Bijan arrived at the hospital, Bijan's personal belongings were collected and transferred to the custody of a Park Police officer.  Nonetheless, though Bijan presumably had

identification on his person and inside his car, Park Police representatives waited about five hours before notifying James and Kelly Ghaisar about the shooting.

124.    James Ghaisar, who had been expecting to meet Bijan for dinner, had repeatedly tried to reach Bijan by cell phone and was waiting to hear back from him.

125.    Park Police detectives did not knock on the door of James and Kelly's home until around 1:00 a.m.

126.    The two detectives who came to the Ghaisars' home showed James and Kelly a picture of the tattoo Bijan had on his torso, lines of Farsi (Persian) script.  The tattoo was a spiritual love poem by Rumi, a 13th-century poet and scholar.  Farsi script resembles Arabic script.

127.    The Park Police detectives told Bijan's parents that Bijan had been transported to Inova Hospital because he had been involved in a "shootout."

128.    The detectives promised the Ghaisar family that they would meet them at the hospital to explain how their son was injured.  These detectives never met the family at the hospital and never provided an explanation.  The family still has received no explanation from any federal official.

129.    Bijan's parents called their daughter, Negeen Ghaisar, who was in Pittsburgh, Pennsylvania, to tell her that her only sibling, Bijan, was in the hospital in critical condition. Negeen Ghaisar and her husband, Kouros Emami, immediately got on a flight to Ronald Reagan Washington National Airport.

**b.** ***Federal law enforcement obstructed the Ghaisar family's ability to make informed medical decisions for Bijan***

130.     When James and Kelly Ghaisar arrived at the hospital, they were told that they were not allowed to see their son and were not given any information about how he was hurt.

131.     Park Police never told the Ghaisar family that two of its officers had shot Bijan. The Ghaisar family learned this fact—about twelve hours after the shooting—when they saw a local news story on a hospital waiting area television.

132.     Throughout the experience at the hospital, Park Police representatives alternately referred to Bijan as a "perp" or "evidence" and told the Ghaisar family that he was "under arrest," even though it was clear to at least one Fairfax police officer present at the scene of the shooting that Bijan "[didn't] really seem to be capable of posing a threat."  Bijan was in a coma.

133.     The Ghaisar family, confused and distraught by these justifications, repeatedly asked the Park Police to explain why they had arrested Bijan.  They also asked Park Police to provide them with a charging document.  The Park Police refused to answer these questions.

134.     Hospital staff informed the Ghaisar family that Bijan was inoperable.  A reviewing physician noted, "This is a hopeless situation. He will deteriorate to brain death, despite our best efforts."  Hospital records also document, "Unfortunately this is non-survivable trauma given poor neurological exam and extent of intracranial injury" and "Severe brain injury which is non-survivable."

135.     Desperate to learn more about Bijan's condition and manage his medical care, Bijan's parents called a close family friend, an affiliate care provider at Inova Hospital.  They reasoned that Park Police would allow a physician who regularly treats patients at Inova Hospital to enter Bijan's room.

136.    This doctor attempted to see Bijan.  Park Police stopped the doctor from entering, forcing him to leave the Intensive Care Unit.  The doctor told the Ghaisar family that in all his years of practice, no one had prevented him from attending to a patient.

137.    The Park Police, and other federal officers, deprived the Ghaisar family of their right to make informed medical decisions for Bijan.  As early as November 18, hospital records note the "[e]xtremely difficult situation as patient is under arrest and for this reason the family may not visit the patient.  Multiple parties have gotten involved to provide the family with the information related to the devastating nature of the patient's injuries and grave prognosis. Discussions ongoing to continue to provide support for the family in the face of the restrictions."

138.    By prohibiting organ donation officials from seeing Bijan or discussing the matter with the Ghaisar family because Bijan was "evidence," the Park Police and other federal officers also interfered with Bijan's decision to donate his organs.

139.    Additionally, having law enforcement treat their son as a criminal without explanation or justification was cruel, incredibly distressing, and unimaginably painful to the Ghaisar family.

c.    ***Park Police continued to guard Bijan's room twenty-four hours a day and severely limit the Ghaisar family's access to him***

140.    The Park Police instructed the Ghaisar family that they could only enter Bijan's room two at a time, only at the top of the hour, and limited to ten to fifteen minutes.  A physician "advised [James, Kelly, and Negeen] to spend time with [Bijan] whenever allowed by the police" but James, Kelly, and Negeen were not permitted to act on that advice.  The physician noted, "They are still in shock."  Hospital records note the impact of this policy on Bijan's care—under "Goals of Care," the records note, "unclear as he is under police custody and family is not even allowed to make decisions at this time from what I understand."

141.    This policy became even more absurd after Kouros Emami—Bijan's brother-in-law and a psychologist—took one of the shifts to see Bijan.  Kouros is tall, has an athletic build, and carries a thick, black beard.  After Kouros saw Bijan, the Park Police modified their own policy and said that only one person, guarded by two Park Police officers, could enter at a time.  Park Police claimed this was necessary in case they needed to restrain one of the family members.

142.    While the Park Police guarded Bijan's room for approximately three days, the Ghaisar family set alarms on their cell phones to avoid missing their ten to fifteen-minute window to see Bijan.  They would nap on the hospital floor in between shifts.

143.    Once inside Bijan's room, the family's movements were closely monitored by the Park Police.  One Park Police officer explained that this was because Bijan's body was "evidence."

144.    At one point, the Ghaisar family authorized a chaplain to pray with Bijan.  The Park Police officers guarding Bijan told the chaplain that she could not touch Bijan because he was Muslim, and Muslims could not be touched by women.

145.    Bijan was not Muslim.

146.    After three days, the FBI took over from the Park Police.  The FBI relaxed many of the restrictions on the Ghaisar family's ability to spend time with their dying son.

147.    When Park Police Chief Robert MacLean finally visited the Ghaisar family in the hospital after the shooting, the Ghaisar family called their attorney to join them for the conversation.  Chief MacLean refused to allow the family to record the conversation.  Chief MacLean told the family that while he was sorry for their loss, he was unable to tell them anything. He went on to say that even if he could tell them something, he would not do so in the presence of their attorney.

### d. *Bijan died on November 27, 2017*

148.    Several doctors told the family that Bijan would not survive and that he was slowly dying of organ failure.   Based on the information provided by the doctors, the family had the hospital remove the feeding and breathing tubes from Bijan after he had survived in a coma for nine days.   That agonizing decision was made all the more difficult because, as hospital records note, "Family is still in shock and grieving this situation . . . It will be very difficult for the family to withdraw care as they are not even allowed to touch him due to the police case."

149.    Bijan survived over ten hours without the respirator.

150.    Bijan was pronounced dead on November 27, 2017.

151.    The Ghaisar family suffered and continues to suffer severe emotional distress because federal law enforcement officers denied them opportunities to comfort and spend time with Bijan in his final days.

152.    Having federal law enforcement officers prevent them from comforting Bijan continues to haunt the Ghaisar family as they wonder how much pain and suffering Bijan experienced from his wounds.   The shots Park Police fired at Bijan shattered his teeth and his left eye.   His mother remembers that one of his ears was hanging off and a gap under the bridge of his nose.   And Bijan's sister, Negeen, recalls sitting near her brother and observing his face swell to such a large size that she wondered if it would burst.   For days, the Ghaisar family had to observe Bijan without the ability to reach out and comfort him.

153.    The Ghaisar family continues to suffer from severe emotional distress because federal officers, including the Park Police, the agency responsible for unlawfully shooting Bijan, also closed him off from the love, care, and comfort of his family and friends as, day after day, Bijan lay dying.

**F. Despite pleading with federal law enforcement for information to deal with the pain of losing their child and brother, these authorities remain silent on virtually all aspects of Bijan's killing**

154.    Twenty-two months after the Park Police killed Bijan, none of the agencies who are involved—including the FBI, the Department of Justice Civil Rights Division, or the D.C. U.S. Attorney's Office—has substantively commented on the case. They have refused to provide, and have stood in the way of others providing, the Ghaisar family with significant information in their possession about the shooting. For example, the Ghaisar family has not been told why Bijan was pursued, or why he was placed "under arrest" at the hospital.

155.    U.S. Government officials continue to stand in the way of federal and state Freedom of Information processes by preventing the Ghaisar family and members of the media from receiving important information about the shooting.

156.    Park Police have said that Bijan's Jeep was involved in an accident, but federal law enforcement refuses to release significant information about the accident.

157.    Even now, twenty-two months after Bijan's shooting, none of the federal agencies have offered even a bare-bones account to explain why Park Police officers repeatedly opened fire on Bijan, who—as the video of the incident shows—presented no threat to himself, the officers, or anyone else.

158.    In fact, the Ghaisar family was only able to view, in January 2018, the video documenting their son's killing because Fairfax County Police Chief Roessler decided to release it against the wishes of the Department of Justice.

159.    As "the administrative custodian of the video," Chief Roessler explained he was "releasing the in-car video of the U.S. Park Police shooting" "[a]s a matter of transparency to all in our community, especially the Ghaisar family." FCPD Media Relations Bureau, *Chief Roessler Releases Video of Nov. U.S. Park Police Shooting in Fairfax Cty.*, Fairfax Cty. Police Dep't News

(Jan. 24, 2018), https://fcpdnews.wordpress.com/2018/01/24/chief-roessler-releases-video-of-november-u-s-park-police-shooting-in-fairfax-county/.

160.    As a result of Bijan's shooting, injuries, and death, and also as a result of the disrespectful treatment they endured in Inova Hospital, James and Kelly Ghaisar experienced and continue to experience severe and lasting emotional and mental distress, including but not limited to anxiety, depression, fear, nervousness, and despair as a direct result of the violations complained of herein.

## FIRST CLAIM FOR RELIEF

### Negligence (Wrongful Death Action)
### pursuant to Va. Code Ann. §§ 8.01-50–8.01-56

161.    The foregoing allegations are re-alleged and incorporated herein by reference.

162.    In pursuing, threatening, shooting, and ultimately killing Bijan, Park Police officers, while working as officers for the UNITED STATES, and acting within the course and scope of their duties, acted negligently, carelessly, recklessly, and unlawfully, breaching a duty to act as reasonable officers would under the circumstances.

163.    Police officers, including Park Police, have a duty to use reasonable care to prevent harm or injury to others.  This duty includes using appropriate tactics, giving appropriate commands, giving warnings, not using any force unless necessary, using less-than-lethal options, and only using deadly force when necessary.

164.    Park Police officers breached this duty while working as officers for the UNITED STATES because *inter alia*, they

(a)    failed to act in a manner consistent with their law-enforcement training;

(b)    failed to communicate reasonably with Bijan during the pursuit;

(c)    failed to use the amount of force that would be deemed necessary by a reasonable officer in a similar situation; and

(d)    failed to follow their own policies.

165.    As a result of the unlawful conduct of the Park Police alleged above, and other undiscovered negligent conduct as to which the Ghaisar family cannot know the details in the absence of any disclosure by law enforcement of the facts surrounding the incident, Bijan sustained fatal injuries that resulted in his death.

166.    As a further result of the unlawful conduct of Park Police officers, James and Kelly Ghaisar suffered and continue to suffer sorrow and mental anguish, loss of Bijan's society, companionship, comfort, guidance, kindly offices, and advice; Bijan's reasonable expected income and his services, protection, care, and assistance, and will continue to be so deprived for the remainder of their natural lives.  They also incurred expenses for Bijan's care, treatment, and hospitalization incident to his injuries, and funeral and burial expenses.

167.    This count is against the UNITED STATES.

### SECOND CLAIM FOR RELIEF

### Wrongful Act (Wrongful Death Action)
### pursuant to Va. Code Ann. §§ 8.01-50–8.01-56

168.    The foregoing allegations are re-alleged and incorporated herein by reference.

169.    Park Police officers, while working as officers for the UNITED STATES, and acting within the course and scope of their duties, threatened to, and did, use unlawful and unnecessary force against Bijan when they pursued Bijan.

170.    Park Police officers, while working as officers for the UNITED STATES, and acting within the course and scope of their duties, caused bodily harm to Bijan by shooting him multiple times, including in the head, and killing Bijan, while he was sitting in his car.

171.     Park Police officers used unreasonable and excessive force when they shot Bijan without Bijan's consent and against his will.

172.     Park Police had no legal justification for threatening to use force or using force against Bijan, and their use of force while carrying out their duties as police officers was an unreasonable and unprivileged use of force.

173.     As a result of the unlawful conduct of the Park Police, Bijan experienced severe pain and suffering from his injuries.

174.     As a further result of the unlawful conduct of the Park Police, Bijan died.

175.     As a further result of the unlawful conduct of Park Police officers, James and Kelly Ghaisar suffered and continue to suffer sorrow and mental anguish, loss of Bijan's society, companionship, comfort, guidance, kindly offices, and advice; Bijan's reasonable expected income and his services, protection, care, and assistance, and will continue to be so deprived for the remainder of their natural lives.  They also incurred expenses for Bijan's care, treatment, and hospitalization incident to his injuries, and funeral and burial expenses.

176.     This count is against the UNITED STATES.

### THIRD CLAIM FOR RELIEF

**Personal Injury (Survival Action)**
**pursuant to Va. Code Ann. § 8.01-25**

177.     The foregoing allegations are re-alleged and incorporated herein by reference.

178.     Police officers, including Park Police, have a duty to use reasonable care to prevent harm or injury to others.   This duty includes using appropriate tactics, giving appropriate commands, giving warnings, not using any force unless necessary, using less-than-lethal options, and only using deadly force as a last resort.

179.     Park Police officers breached that duty when they shot Bijan multiple times.

180.    As a result of the negligent and/or intentional acts of its employees, Defendant UNITED STATES caused Bijan to suffer grave personal injuries. Those injuries caused Bijan to require treatment at Inova Hospital for ten days following the shooting.

181.    This survival claim for Bijan's personal injuries is pled in the alternative to Plaintiffs' claims for Bijan's wrongful death. Plaintiffs will elect between their causes of action at the appropriate time.

182.    This count is against the UNITED STATES.

## FOURTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

183.    The foregoing allegations are re-alleged and incorporated herein by reference.

184.    The Ghaisar family further alleges that the intentional and reckless conduct of Park Police officers and other federal officers, including fatally shooting their son, was outrageous and intolerable.

185.    Park Police officers and other federal officers undertook these actions with intentional and reckless disregard of the substantial likelihood of causing severe emotional distress to the Ghaisar family.

186.    As a result of the unlawful conduct of federal law enforcement, the Ghaisar family witnessed their only son struggling for life while in a coma, and thereby suffered extreme emotional distress, including grief, anxiety, worry, shock, apprehension, terror, and mental anguish.

187.    As a further result of the unlawful conduct of federal law enforcement, including the treatment they suffered while at Inova Hospital, James and Kelly Ghaisar suffered and continue to endure severe and emotional distress, resulting in acute depression and damage to their well-

being that persist to this day.  The Ghaisar family has experienced severe emotional pain and suffering.

188.    This count is against the UNITED STATES.

## DAMAGES

189.    As a result of Defendants' unlawful conduct, Bijan suffered fatal injuries and monetary damages.  His death, on November 27, 2017, injured the Ghaisar family.

190.    As the surviving parents of Bijan and as personal representatives and co-administrators of the Estate of Bijan Ghaisar, the Ghaisar family seeks damages to compensate for, *inter alia*:

a.   Their sorrow and mental anguish, and loss of Bijan's society, companionship, comfort, guidance, kindly offices and advice, pursuant to Va. Code Ann. § 8.01-52(1);

b.   Loss of Bijan's reasonably expected income, and his services, protection, care, and assistance, pursuant to Va. Code Ann. § 8.01-52(2);

c.   Medical and hospital expenses for care, treatment and hospitalization incident to Bijan's final injuries and death, pursuant to Va. Code Ann. § 8.01-52(3); and

d.   Funeral and burial expenses, pursuant to Va. Code Ann. § 8.01-52(4).

191.    As a further result of Defendants' unlawful conduct, the Ghaisar family suffered damages associated with their severe emotional pain and suffering, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, for the reasons stated above, the Ghaisar family respectfully requests that the Court enter a judgment against Defendant:

1.  Awarding compensatory damages to Plaintiffs in the amount of $25,000,000;

2.  Awarding damages recoverable under Va. Code Ann. § 8.01-25 and §§ 8.01-50–8.01-56;

3.  Awarding Plaintiffs attorneys' fees and costs pursuant to federal and state laws, including 28 U.S.C. § 2412; *and*

4.  Ordering such other and further relief as the Court considers just and proper.


Dated: September 19, 2019                         Respectfully submitted,

<span style="margin-left:4em;">/s/ Thomas G. Connolly</span>
Thomas G. Connolly (VA Bar No. 29164)
Roy L. Austin, Jr. (*for pro hac vice admission*)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street NW, 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
*tconnolly@hwglaw.com*
*raustin@hwglaw.com*

*Counsel for Plaintiffs*