# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

JAMES GHAISAR, et al.,

      Plaintiffs,

v.

UNITED STATES OF AMERICA,

      Defendant.

Civil Action No. 1:19-cv-01224

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Government's attempts to twist the facts approach the breaking point in its response to Plaintiffs' motion for summary judgment. It strains to describe the slight movement of Bijan's Jeep during the shooting in a way that suggests some hint of danger to the officers. The Government finds a variety of creative, if not compelling, ways to reframe the undisputed facts: It refers to Officer Amaya as being "in close proximity to the direct path" of the Jeep during the shooting. It claims that the Jeep "could have reached" Officer Amaya in a second when the officer began shooting. It describes the Jeep as moving in a direction that a reasonable officer could "believe was towards Officer Amaya" (raising the question whether a reasonable officer could believe right is left and left is right). And when in doubt, it constantly falls back on the misleading refrain that Officer Amaya was "at the front" of the Jeep.

Meanwhile, the Government keeps up its shameless effort to slander Bijan and paint him as a dangerous criminal. With no support from the video itself for this, the Government relies on unreliable, self-serving, post hoc statements by the officers, while they were under criminal investigation. The Government makes almost no effort to keep up the pretense that it is relying

on the officers' statements only insofar as its expert used them, even though it knows the statements are inadmissible on their own. At the same time, the Government argues that Plaintiffs have no right to adverse inferences based on the officers' refusal to testify, even as it spells out for the Court the unfairness to Plaintiffs this would create.

Then, the Government writes off the Park Police's treatment of the Ghaisar Family at the hospital as almost *benevolent*—relaxing their usual policies to alleviate the family's suffering. It misses the fact that the Park Police were holding Bijan, while in a coma in his final days, under "arrest" without ever bothering to seek a probable cause hearing, even though officers knew Bijan was not going to survive and that their intentional actions were making an already horrific situation dehumanizing for the family.

The Government is wrong on the law. It is more wrong on the facts. The Park Police's conduct was not only wrong, it was abhorrent. More importantly, it was unlawful under the FTCA. Plaintiffs are entitled to summary judgment on the question of whether the Government is liable for the Park Police officers' conduct in this case.

**ARGUMENT**

## I.  THE GOVERNMENT'S FACTUAL DISPUTES ARE MERE DISTRACTIONS

The Government continues to push its implausible and misleading interpretation of the video in its dispute of Plaintiffs' facts. For instance, it suggests that the officers could have believed Bijan had committed a felony (Def.'s Opp'n to Pls.' Mot. for Summ. J., Dispute of Facts ¶ 12)—a conclusion that could only be based on speculation. *See Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). Then, in response to Plaintiffs' claim that the Jeep barely moved before the shooting, the Government makes the unrelated claim that the Jeep moved a full car length *during* the shooting. *Id.* ¶ 113. The Government also states

that Officer Amaya "stood in front of" the Jeep at 19:41:29 of the video. *Id.* ¶ 39-42. However, the Jeep was not moving at that moment; by the time it moved Officer Amaya was clearly to the side of the Jeep. Video at 19:41:32. Meanwhile, the Government continues to use Officer Vinyard's inadmissible statements to state as a matter of fact that Bijan was impaired (Def.'s Dispute of Facts ¶ 53). It cannot do that. *See infra* § II.B.

The Government also incorrectly argues that Officer Gohn's testimony is irrelevant. In fact, a law enforcement officer can testify about the reasonableness of officers' conduct if the testimony is based on the officer's "contemporaneous perceptions." *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006). This is true even where such testimony is informed by the witness's "particularized experience as [a] police officer[]." *Id* at 156. Officer Gohn testified about his opinions on the reasonableness of Officers Amaya's and Vinyard's conduct during the pursuit, based on his "contemporaneous perceptions" of the pursuit and the officers' conduct. Thus, his testimony is relevant.

Otherwise, many of the Government's disputes focus on the inferences to be drawn from the clear facts. Some of these seem to be aimed solely at creating a material dispute of facts. For instance, the Government takes issue with Plaintiffs' theory of how many shots were fired in total (Def.'s Dispute of Facts ¶ 43) and says that Officer Amaya "appears to be holding a flashlight" at the time the last shots were fired (*id.* ¶ 49). Disputes like these do not ultimately change the outcome, because all of the shots were unlawful.

## II. THE GOVERNMENT IS NOT ENTITLED TO BENEFIT FROM THE OFFICERS' REFUSAL TO TESTIFY

### A. The Court Should Draw Adverse Inferences in Ruling on Summary Judgment

Plaintiffs' assertion that they are entitled to adverse inferences based on the officers' refusal to testify in this case is well supported by both case law and basic fairness principles. As

this case demonstrates, it is unfair to allow a party to rely on a witness's statements that the other party has no chance to challenge. That is why courts have repeatedly found it appropriate to turn to remedies like striking self-serving statements and granting adverse inferences based on witnesses' invocation of the Fifth Amendment. *See* Pls.' Opening Summ. J. Br. at 6; *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991); *Deakins v. Pack*, 957 F. Supp. 2d 703, 739-40 (S.D.W.Va.) (collecting examples). Here, Plaintiffs have been thoroughly disadvantaged by the officers' invocation of the Fifth Amendment. Plaintiffs have had no real opportunity to cross-examine the officers' self-serving assertions to the FBI, even as the Government has built its narrative around Officer Vinyard's statements.

As discussed in Plaintiffs' reply on the motion to strike, the Government's claim that Plaintiffs cannot seek adverse inferences without pointing to "some independent evidence" supporting the reliability of the adverse inferences mischaracterizes the law. Not only that, the Government's interpretation would undermine the purpose of adverse inferences, which is to "provide[] some relief for the civil litigant whose case is unfairly prejudiced by a witness' assertion of the Fifth Amendment privilege." *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 633 (E.D. Va. 2006)).

*Custer Battles* itself contradicts the Government's characterization of the law. The *Custer Battles* court did not hold that independent evidence is "required" to draw an adverse inference on a given fact. In fact, the court allowed the jury to draw adverse inferences *without* finding that there was independent evidence to support the facts for which the inferences were offered. *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 635-36 (E.D. Va. 2006). It simply sought independent evidence that the witness had "personal knowledge of the subject about which he refuse[d] to testify." *Id.* at 634. The court explained that the independent

evidence "requirement" is intended to "avoid allowing adverse inferences from the refusal to give testimony in situations where the testimony, if given, would presumably be speculative in nature." *Id* at 635. Here, inferences from the officers' refusal to testify would not be speculative.

At any rate, the admissible evidence in this case *does* support the adverse inferences Plaintiffs seek. The Government's suggestion that Plaintiffs' proposed adverse inferences are belied by the video evidence simply demonstrates again how detached the Government's interpretation of the video of the shooting is from reality. A reasonable interpretation of the video (as opposed to the skewed version the Government presents as an "objective" interpretation) supports the adverse inferences that the officers did not fear for their safety (*see infra* § C.ii), that Officer Amaya knew Bijan could not go anywhere once he was pinned between the police cruiser and the ditch, that the movement of Bijan's Jeep during the shooting was consistent with someone lightly lifting their foot off the brake, and that Bijan never came close to hitting either officer. *See* Pls.' SUMF ¶¶ 110, 112, 114, 117; Video of Incident 19:41:30-19:42:00. And the video *plainly* shows that Bijan's Jeep barely moved forward before the first shot and that no one was at any risk of injury between the time Bijan stopped at the stop sign and the time the shooting began. ¶¶ 113, 118; Video 19:41:30-35. The video also shows that to the extent the Jeep moved forward, it was moving away from both officers. ¶ 115; Video 19:41:30-19:42:00. Finally, there is no evidence in the record that supports the inference that Bijan ever threatened the officers (¶ 116).

The Government makes an extra effort to point to record evidence it claims belies the inference that the officers did not fear for their safety. In doing so, it again makes Plaintiffs' case for them. Through its cited exhibits the Government is implicitly arguing that the adverse inference is contrary to *the officers' own statements* and the other record evidence to which the

Government has repeatedly pointed to bolster Officer Vinyard's self-serving statements about his impressions of Bijan during the pursuit. *See* Def.'s Opp'n to Pls.' Mot. for Summ. J. (citing, among other things, the expert reports' references to the officers' claims that they feared for their safety and testimony that officers smelled marijuana in the Jeep after the shooting).

This is simply incredible. The Government is surely aware, at a minimum, of the discussion in *Custer Battles* about the purpose of adverse inferences. 415 F. Supp. 2d at 633; *see* discussion *supra*. Yet it argues that Plaintiffs are not entitled to an adverse inference regarding the officers' fear because the inference is contradicted by the *very evidence* that the officers' invocation of the Fifth Amendment has precluded Plaintiffs from cross-examining. This is obviously not what the *Custer Battles* court or any other court intended when they asked for some independent evidence to ensure that an adverse inference is reliable evidence.

The Government's repeated and unabashed efforts to gain from Plaintiffs' disadvantage in this case epitomizes the need for adverse inferences on the points for which Plaintiffs have requested them. The inferences Plaintiffs seek are supported by reasonable interpretations of the record evidence. The Court can and should draw the adverse inferences for purposes of ruling on summary judgment. *See, e.g.*, *Maryland v. Univ. Elections, Inc.*, 862 F. Supp. 2d 457, 464 (D. Md. 2012) (adverse inference, "[c]ombined with the other evidence . . . leaves no genuine dispute" of material facts), *aff'd*, 729 F.3d 370 (4th Cir. 2013).

## B. The Court Should also Strike or Ignore the Government's Uses of the Officers' Self-Serving Statements

Even if the Court does not grant adverse inferences, it should strike or ignore the officers' statements, both because of their refusal to testify and because the statements are hearsay. The Government argued in its response to Plaintiffs' motion to strike that the Court can consider the statements because the experts in the case rely on them. But as Plaintiffs explained, this is not

true. Neither expert relies on Officer Vinyard's statements about Bijan looking "zombie-like" and impaired by "more than marijuana" in evaluating the reasonableness of the shooting. And at this point it is clear that even if the Government's expert did rely on the statements, the Government is attempting to use the statements for their truth, not to "explain the basis of [Mr. Ryan's] opinion." *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984). It cannot do this. *Id.*; *see also* McCormick on Evid. § 324.3 (similar, collecting cases).[1] Nor could it use Mr. Ryan as a "mere conduit" to introduce the statements at trial. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013). The statements are inadmissible; if the Court does not strike them, it should at the very least ignore them when ruling on summary judgment.

## III. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR WRONGFUL DEATH CLAIMS

The Government does not dispute that the evidence establishes the three elements of Plaintiffs' *prima facie* wrongful death claim: That the officers (1) willfully (2) shot Bijan, (3) causing his death. *See Montague v. Commonwealth*, 684 S.E.2d 583, 588 (Va. 2009). As discussed in Plaintiffs' opening brief and below, it is therefore the Government's burden to show that the officers acted to avoid imminent, serious harm to themselves or others. *Couture v. Commonwealth*, 656 S.E.2d 425, 428 (Va. Ct. App. 2008). The briefing demonstrates that even viewed in the light most favorable to the Government, the facts would not allow a reasonable factfinder to conclude that the Government has met its burden on the record in this case.

---

[1] Plaintiffs' expert did not rely on Vinyard's self-serving statement in the sense that he took the statements as true. In fact, he questioned the value of the statements. *E.g.* Patrick Report (DEX 7) at 12 (calling Officer Vinyard's "articulation of [the] threat [ ] not supported" by the video). Plaintiffs' expert commented on some of those statements because there was no other source for much of that information and he used the statements to note that even if Vinyard's statements were true, the shooting was still unreasonable. *E.g.* Patrick Dep. (DEX 31) 51:24-52:3.

### A. Under Settled Virginia Law, the Government Has the Burden to Show that the Officers Acted in Self-Defense to Avoid Liability

The Government continues to misread Virginia law regarding Plaintiffs' wrongful death claims. That is because it relies heavily on federal cases citing basic points of Virginia law without analysis and does not examine the important nuances of the law. Virginia law is settled on the two points on which the Government does not agree with Plaintiffs: 1) it is the Government's burden to show that the officers' use of deadly force was justified, and 2) to do so, the Government must show that the officers reasonably *and actually* believed deadly force was necessary to avoid imminent danger.

Regarding the burden, the Government largely avoids the question of whose burden it is to justify the officers' conduct. It simply notes that where a law enforcement officer has "legal justification for" an unwanted touching, the act is not a battery. *See* Def.'s Opp'n to Pls.' Mot. for Summ. J. (Dkt. No. 98) at 12. That does not answer the question of whose burden it is to show that the act is justified. In fact, it is hornbook law that in tort law, "the privileges to defend self or others are affirmative defenses, on which the defendant ordinarily has the burden of proof." Dan B. Dobbs, *et al.*, *The Law of Torts* (2d ed.), § 80, *Self-defense and defense of others generally*. The law in Virginia is no different, even for police officers. Once a plaintiff makes out a *prima facie* case for battery, if an officer relies on "legal justification for infliction of the [injury] . . . as a defense," then the officer must establish that defense. *Pike v. Eubank*, 90 S.E.2d 821, 827 (Va. 1956); *see also Bourne v. Richardson*, 113 S.E. 893, 898 (Va. 1922) (noting that jury instruction that "the burden is on the defendant [police officer] to show by a preponderance of the evidence that the arrest was by authority of law" "stated the rule . . . correctly"); *Cromartie v. Billings*, 837 S.E.2d 247, 253 (Va. 2020) (trial court instructed jury that defendant police officer had the burden to demonstrate that arrest was lawful).

Meanwhile, the Government relies on inapplicable law to support its assertion that the Court need only find that the officers used "reasonable force" to conclude that the shooting was justified. It cites almost entirely to cases involving the question of whether an officer used reasonable force in a nondeadly arrest. *E.g. Patterson v. United States*, 2019 WL 4934951, at *3 (E.D. Va. 2019) (force resulted in "a lump on plaintiff's forehead"); *Carter v. Khan*, 2015 WL 6738607, at *13 (E.D. Va. 2015) (taser usage); *Williams v. Brumbaugh*, 2011 WL 2077794, at *5 (E.D. Va. 2011) (use of pepper spray).[2] But the standard in Virginia for an officer's use of force in a nondeadly arrest is different than the standard for the use of *deadly* force. The question for a nondeadly arrest may be whether the officer used reasonable force, but where an officer uses deadly force, the question, clearly, is "whether or not the officer acted in self-defense." *Banks v. Bradley*, 66 S.E.2d 526, 530 (Va. 1951) (wrongful death case against officer). And it is "well settled" in Virginia that "the law of self defense is the law of necessity." *Id.* (citing *Scott v. Commonwealth*, 129 S.E. 360 (Va. 1925) (criminal case). To establish that deadly force was necessary, a police officer must show that "the necessity to kill *did in fact* reasonably appear to the officer to exist when he shot." *Banks*, 66 S.E.2d at 530 (emphasis added).

Notably, the law on this issue is the same in civil and criminal cases, as demonstrated in *Banks*, where the Virginia Supreme Court relied largely on criminal case law to define self-defense in a civil wrongful death lawsuit. *See id.* Hence, Plaintiffs' reliance on *Couture*, 656 S.E.2d 425, to elucidate the boundaries of the defense was not inapt. *See also* Dobbs, *The Law of*

---

[2] The Government does cite to two cases that involved wrongful death claims: *Austin v. Town of Blacksburg*, 66 F. Supp. 2d 771, 776 (W.D. Va. 1998), and *Lawhorn v. Edwards*, 2020 WL 4589195, at *15 (E.D. Va. 2020). But in *Austin* the facts clearly supported a finding of subjective fear (*see* 66 F. Supp. 2d at 773), and in *Lawhorn* the court dismissed the battery claim only as to the initial arrest, not the portion that led to the arrestee's death (2020 WL 4589195 at *16).

*Torts*, § 80 ("[C]riminal precedents are often good guides to the tort law rule. . ."). And contrary to the Government's reading, nothing in *Couture* suggests that the test for self-defense in Virginia is solely one of reasonableness. *See id.* at 428 ("A defendant may always act upon reasonable *appearance* of danger, and whether the danger *is* reasonably *apparent* is always to be determined from the viewpoint of the defendant at the time he acted.") (emphasis added). Moreover, other Virginia criminal cases support the same reading.[3] *See, e.g.*, *Peeples v. Commonwealth*, 519 S.E.2d 382, 386 (Va. Ct. App. 1999) ("To justify the use of deadly force, the defendant must have reasonably *feared* death or serious bodily injury from his victim . . .") (emphasis added); *McGhee v. Commonwealth*, 248 S.E.2d 808, 810 (Va. 1978) (similar, and noting the "subjective nature of the defense").

The Government relies on string citations to give the appearance of substance to its argument that the sole question here is objective reasonableness. But the Court can easily see for itself that the cases cited by the Government are not helpful. Notwithstanding the federal cases providing bare statements of state law with no analysis of similar factual scenarios, it is settled law in Virginia that a law enforcement officer can use deadly force only in self-defense, and that to establish self-defense, he (and here, via the FTCA, the Government) must show that he reasonably feared death or serious injury.

---

[3] As the *Couture* court's reliance on a case that did not involve a police officer (*Thomason v. Commonwealth*, 17 S.E.2d 374, 378 (Va. 1941)) demonstrates, the scope of the defense of self-defense is largely the same for police officers as for civilians in Virginia. *Couture*, 656 S.E.2d at 431.

**B. The Government Cannot Establish Either Element of Self-Defense**

*i. No reasonable officer would have shot Bijan.*

The Government's argument on the reasonableness of the shooting is largely a rehashing of the fantastical interpretation of the video evidence that it presented in its own summary judgment briefing. It leans heavily on the loaded claim that Officer Amaya was "at the front" of Bijan's Jeep during the shooting. The Government, in fact, uses the phrase "at the front" sixteen times in its brief. But that repetition does not change the fact that the video clearly shows that Officer Amaya was not in danger of being run over by the Jeep, and indeed was *near* the front of the Jeep because that is where he chose to be in order to point his gun at Bijan and ultimately begin shooting him, at point-blank range, within an instant of the Jeep beginning to roll forward and sharply away from him. Video of Incident 19:41:30-33.

Before it begins its surrealist account again, though, the Government lays out the four "warnings" that Bijan had displayed to the officers before the final stop. None of these warnings would sway a reasonable factfinder on the reasonableness of the shooting. The Government's claim that the officers knew Bijan was impaired relies on inadmissible evidence. The fact that Officer Amaya at one point tried to jerk Bijan's door open while pointing a gun at him does not establish that he believed Bijan was dangerous—the video shows only that Officer Amaya was angry when this happened, not scared. The video does not show Bijan driving "erratically and dangerously," and although he did not stop for another private motorist on a dark highway, he did attempt to stop twice for the officers before they charged at his vehicle with guns drawn. In fact, the video shows many more warnings about the *officers'* potential danger than Bijan's.

a.   The first volley of shots

Apparently grasping at straws, the Government begins its defense of the first volley of shots with a new fact: that Bijan's left turn signal was on when the Jeep began rolling forward as Officer Amaya stood "at the front" of the Jeep (plainly well to the side of it). Def.'s Opp'n at 17. As usual, the Government never explicitly states what the Court should conclude from this. This is presumably because the Government realizes this fact would not cause any reasonable factfinder to question whether either Officer Amaya or Officer Vinyard could have believed that Bijan was preparing to run Officer Amaya over. (The blinker had been on at least from the time Bijan stopped at the stop sign, Video 19:41:19, and as soon as the Jeep began rolling it moved sharply to the right and away from Officer Amaya. And anyway, why would anyone who was in fact attempting to run down an officer use his turn signal to signal his intentions?)

The Government next proceeds to rehash its discussion of *Waterman v. Batton*, 393 F.3d. 471, 474-75 (4th Cir. 2005). The Government attempts to highlight the supposed similarities between this case and *Waterman* by quoting *Waterman* in its description of Bijan's actions leading up to the shooting. Def.'s Opp'n at 19. However, as much as it would like to, the Government cannot turn this case into *Waterman*. First, in *Waterman*, at the time the decedent "was not stopping" and was "accelerating in the general direction of" the officers, he was moving faster than 10 miles an hour *before* his vehicle "lurch[ed] or lung[ed] forward," and he was 16 feet from the nearest officer, meaning he had the distance to maneuver his vehicle to hit the officer. *Waterman*, 393 F.3d at 474-75. Here, on the other hand, Bijan's Jeep clearly came nowhere close to moving 10 miles per hour either before Officer Amaya began shooting or during the course of the shots he fired; nor did the Jeep ever "lurch" forward. Moreover, Officer Amaya was standing next to the Jeep, leaving absolutely no chance that Bijan could maneuver

the Jeep to hit Officer Amaya. Finally, it is comical that the Government attempts to use *Waterman*'s language regarding the "split-second nature" of officers' decisions and the fact that the vehicle in that case "could have reached [the officer] in about one second" to describe the situation here. Def.'s Opp'n at 20. If the Government believes that the Jeep could have turned and reached Officer Amaya in one second at the time Officer Amaya fired the first shot (19:41:33) at a dangerous speed, then the Government itself is disturbingly credulous.

Meanwhile, it is far from clear that a reasonable factfinder would conclude from the video that Bijan had been driving "recklessly" prior to the final stop. (It would also be inappropriate for a factfinder to be allowed to consider Officer Vinyard's self-serving claims that he believed Bijan was impaired during the pursuit.) And it is hardly fair to say that Bijan was "by any account [ ] not acting rationally" during the pursuit. Def.'s Opp'n at 19. Bijan had stopped twice for the officers only to have them rush toward his Jeep with guns aimed at his head; given the ultimate outcome of the pursuit, his decision to pull away in those instances hardly appears unreasonable.

  b. The second and third volleys of shots

The Government's defense of the second volley of shots again relies heavily on *Waterman* as well as *Bethea v. Howser*, 447 F. Supp. 3d 497, 513 (E.D. Va. 2020). Again, this case is plainly distinguishable from *Waterman* for the reasons discussed above. It is also clearly different from *Bethea*. In *Bethea*, the car's "engine race[d]" and its tires "suddenly start[ed] to spin very fast as [the driver] accelerated . . . and turned its tires in [the officer's] direction, causing the [car] to move toward [the officer.]" *Bethea*, 447 F. Supp. 3d at 505. Moreover, "the threat of serious harm was exacerbated by [the officer's] perception that [the driver] was brandishing a firearm from inside the car," 447 F. Supp. 3d at 513.

In short, neither *Waterman* nor *Bethea* supports the Government. Turning to the Government's other arguments, with regard to the second set of shots: the video at 19:41:42-43 shows Officer Vinyard's hand recoiling, so he fired at least one shot. The Government argues that this was justified because Officer Amaya was "at the front" of the Jeep. Def.'s Opp'n at 20. Again, the video quite clearly shows that Officer Amaya was not in danger at this point, given that he was at best "at the 11:00 or 10:00 position" relative to the Jeep, *id.* at 21, and that the Jeep was clearly rolling away from him and toward the ditch.

The Government's argument on the third volley of shots is much the same as the second, and it fails for the same reasons, except that at this point it would have been even clearer to any reasonable officer that the Jeep was beginning to roll into the ditch. No reasonable officer could have believed he was in imminent danger of serious harm at this point.

Finally, the Government makes a handful of references to the potential danger posed to the public if the officers had not shot Bijan. Nothing in the video would allow a reasonable factfinder to conclude that Bijan posed a threat to the public. But even if it could, he would not have posed the imminent, serious danger that Virginia law requires. *Couture*, 656 S.E.2d at 428.

      ii.   *There is less than a scintilla of evidence to support the conclusion that the officers actually feared imminent harm.*

Given the clear lack of evidence and the Government's misunderstanding of Virginia law, it is no surprise that it makes only a half-hearted argument that the officers' use of force was subjectively reasonable. The Government relies entirely on its expert report for this argument. But to the extent its expert report gives any insight at all into the officers' state of mind, that must come through the officers' self-serving statements—and once again, the Government is ultimately using its expert as a "mere conduit" for those statements. This highlights the unfairness of the Government's attempt to rely on the officers' statements to establish a central

fact of the case, and reinforces the conclusion that Plaintiffs should be entitled to an adverse inference on the officers' subjective lack of fear. But even without that, even viewed in the light most favorable to the Government, its paltry evidence on this point is not enough to create a material issue of fact. Indeed, even with the unfair advantage it affords itself by relying on the officers' statements, the Government cannot point to anything that actually states that the officers believed they feared *imminent*, *serious* harm. Def.'s Opp'n at 26. And at any rate, the Government's argument is belied by the video. The video shows the officers rushing toward Bijan's Jeep twice before the shooting, with Officer Amaya striking the Jeep with his gun and kicking it. Video of Incident at 19:38:19-27, 19:40:13-15. It also shows Officer Amaya move toward the Jeep again at the last stop before opening fire. *Id.* at 19:41:31-33. Based on these facts, no reasonable factfinder could find that the Government has met its burden of proving the officers actually feared for their lives.

### C. The Government Is Liable on the Wrongful Death Claims Regardless of Whether the Shooting Was Justifiable Because the Officers Were Outside of Their Jurisdiction

Finally, the Government completely misses the point of Plaintiffs' argument that the use of force here was *per se* wrongful. Plaintiffs are not arguing negligence *per se*. Rather, Plaintiffs argue that the officers' use of force was wrongful regardless of whether they reasonably believed they were in imminent danger, because their conduct would have been barred by Virginia law. To reiterate: Under the FTCA, the Government is liable on Plaintiffs' wrongful death claim if a private person would be liable for the conduct Officers Amaya and Vinyard engaged in. *United States v. Olson*, 546 U.S. 43, 46-47 (2005). In Virginia, a police officer is not entitled to make an arrest outside of his jurisdiction. *Banks v. Bradley*, 66 S.E.2d 526, 529 (Va. 1951); *Hoambrecker v. City of Lynchburg*, 412 S.E.2d 729, 730 (Va. Ct. App. 1992). Thus, "*whatever force* [an officer] use[s] in his attempt to effect" an out-of-jurisdiction arrest is unlawful. *Banks*, 66 S.E.2d

at 529 (emphasis added). Here, the officers were outside their jurisdiction when they shot Bijan. MacLean Dep. 68:14-17. Therefore, judging the officers' conduct under the standard that would apply to a private person in Virginia, the Government is liable for their use of force *per se*—that is, whether or not the officers' conduct was otherwise justifiable.

Importantly, the officers are liable regardless of what the Park Police policies state regarding their jurisdiction. The FTCA does not require that the officers had notice that their conduct would violate its terms. But even if it did, Plaintiffs' discussion of the policies demonstrates that the officers knew that they were outside of their jurisdiction and were required to relinquish control of the pursuit to Fairfax County officers "[a]s soon as practical." Pursuits Policy (Pls.' Summ. J. Ex. 18) at 5. And despite the Government's expert's testimony regarding the practicability of relinquishing control, the Government does not dispute that Officer Gohn at one point took the *lead* in the pursuit, yet Officers Amaya and Vinyard overtook him.

## IV. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

The Government concedes that Plaintiffs have "certainly" satisfied the severe emotional distress requirement for an intentional infliction of emotional distress claim. Def.'s Opp'n at 28. Despite acknowledging the tremendous harm inflicted upon the Ghaisar Family, the Government attempts to escape liability by arguing that intentional infliction of emotional distress claims are "not favored" under Virginia law. *Almy v. Grisham*, 639 S.E. 2d 182, 187 (Va. 2007). However, emotional distress claims are disfavored largely "[b]ecause of problems inherent in proving a tort alleging injury to the mind or emotions in the absence of accompanying physical injury." *Id.* As the Government has conceded that the fourth emotional distress element, the family's injury, is not at issue, the rationale for disfavoring the claim is substantially undercut. Moreover, based on

the undisputed evidence, the Park Police's outrageous actions at Inova Fairfax Hospital clearly satisfy each of the remaining three elements of an emotional distress claim.[4]

## A. Park Police Officers Knew or Should Have Known That Their Conduct Would Cause Plaintiffs Emotional Distress

The first element of an emotional distress claim requires that "the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result." *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974). As Plaintiffs have already demonstrated to this Court, they are not required to show that the Park Police acted with the "specific purpose" of causing them emotional distress—rather, they need only show that the officers intended their specific conduct and "knew or should have known that emotional distress would likely result." *Id.*

Here, the Park Police engaged in several intentional acts, including implementing and maintaining a draconian visitation schedule, which clearly caused Plaintiffs severe emotional distress. Any reasonable person would know that forcing a parent to leave the bedside of their dying child would cause severe emotional distress. The Government's attempts to argue otherwise are, frankly, insulting to the Ghaisar Family.

## B. The Park Police's Conduct at the Hospital Was Outrageous

As to the second element of a claim for intentional infliction of emotional distress, the Park Police's conduct was clearly so "outrageous and intolerable in that it offends against the generally accepted standards of decency and morality." *Id.* The Park Police acted with immeasurable cruelty by imposing and enforcing a program in which Bijan's grieving loved ones

---

[4] For the reasons discussed in Plaintiffs' response to the Government's motion for summary judgment, the court has subject matter jurisdiction over this claim. Pls.' Opp'n to Def.'s Mot. for Summ. J. at 20-23.

were forced to leave his side over and over again, each time feeling the pain of knowing that they might never again see him alive.

The Government attempts to argue that this conduct was not outrageous and intolerable because Bijan was under arrest and thus the Park Police acted reasonably by restricting visitation. This justification does not stand up to scrutiny. The Government claims that the Park Police limited visitation because they "had to balance important interests of evidence preservation, officer safety, and resource allocation." Def.'s Opp'n at 29. However, the Government also claims that Bijan was arrested for "fleeing to elude arrest, possession of marijuana, and associated traffic violations." DEX 20 at 135. How the need for "evidence preservation" supported limited visitation in this context is unfathomable. Further, the Government does not even *attempt* to explain why the Park Police believed that a comatose man and his grieving family presented a risk to officer safety.

Additionally, as discussed more fully in Plaintiffs' response to the Government's motion for summary judgment, the Park Police violated Bijan's constitutional rights by detaining him for more than 48 hours without a probable cause hearing. *See United States v. Van Metre*, 150 F.3d 339, 347 (4th Cir. 1998) (citing *Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991)) ("[A] detention of more than forty-eight hours without a judicial determination of probable cause is presumed unconstitutional . . . ."); Pls.' Opp'n to Def.'s Mot. for Summ. J. at 20-21. The Government cannot justify the Park Police's actions by stating that Bijan was under arrest when that arrest violated the Fourth Amendment. *See Telkamp v. Vitas Healthcare Corp. Atl.*, No. 3:15-CV-726, 2016 WL 777906, at *18 (D. Conn. Feb. 29, 2016) (finding that plaintiff's intentional infliction of emotional distress claim should survive dismissal because she had pled

that defendant acted "without lawful justification . . . for the purpose of keeping [her] from returning to her dying daughter's bedside").

Even assuming the Park Police somehow acted reasonably by implementing their nonsensical visitation schedule, which Plaintiffs do not concede, the Park Police's outrageous actions were not limited to merely imposing a visitation schedule. The Park Police informed the Ghaisar Family that if they violated the rules of the visitation schedule, they "would never be able to see [Bijan] again." N. Ghaisar Dep. 50:9-51:14. This callous statement implied to the family that Bijan would die in the hospital, and, if the family made any error, he would die alone. Further, as Bijan lay dying, *as a result of the Park Police's brutality*, Park Police officers referred to Bijan as a "perp" in front of his family. K. Ghaisar Dep. 76:25-77:4. They also assumed, with no basis whatsoever, that Bijan was Muslim and thus did not allow him to be touched by the female chaplain the Ghaisar Family asked to pray over Bijan. Through this type of outrageous conduct, the Park Police went beyond merely restricting visitation and made the distraught Ghaisar Family feel "like animals." N. Ghaisar Dep. 59:10-11; *see also* J. Ghaisar Dep. 63:18-23.

## C. The Park Police's Misconduct Caused the Ghaisar Family's Severe Emotional Distress

Finally, the Government weakly attempts to dispute the causal connection between the Park Police's outrageous conduct and Plaintiffs' emotional distress. Notably, the Government fails to raise this argument in its motion for summary judgment, and instead argued that only the first two elements of Plaintiffs' claim were not met. For some reason, the Government sees fit to now argue that because the FBI also imposed certain visitation rules, there can be no causal connection between the Park Police's conduct and the Ghaisar Family's emotional distress.

But as Plaintiffs have already argued to this Court, the Government's characterization ignores several relevant facts. For example, the FBI's policies were not identical to the Park Police's—the FBI lifted restrictions like the time restriction that the Park Police had imposed on the Ghaisars' visitation. N. Ghaisar Dep. 55:3-13. The Government also ignores James and Kelly's objection to Park Police officers guarding their son after Park Police officers had shot their son. And, the Government fails to explain the Park Police officers' refusal to allow a female chaplain to touch Bijan as she prayed for him, based on their assumption that Bijan was Muslim; and it fails to mention that James and Kelly learned from watching the news in the hospital waiting room, and not from Park Police officers, that Park Police officers had fired the shots that put Bijan in the hospital. *All* of these outrageous actions caused James and Kelly severe distress.

The simple fact is that the Park Police acted outrageously and intolerably by intentionally taking action that they knew or should have known would cause emotional distress and the Ghaisar Family experienced severe emotional distress *as a result* of those actions.

## CONCLUSION

For the reasons discussed above and in Plaintiffs' opening brief, the Court should enter summary judgment for Plaintiffs on the Government's liability.

Dated: October 15, 2020

Respectfully submitted,

/s/ Thomas G. Connolly
Thomas G. Connolly (VA Bar No. 29164)
Roy L. Austin, Jr. (*pro hac vice*)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street NW, 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
tconnolly@hwglaw.com
raustin@hwglaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I filed the foregoing via the CM/ECF system, which will

send a Notification of Electronic Filing to the following:

Dennis C. Barghaan, Jr.
Kimere J. Kimball
Attorneys for the United States
dennis.barghaan@usdoj.gov
kimere.kimball@usdoj.gov

Dated: October 15, 2020                               Respectfully submitted,

                                                                    /s/ Thomas G. Connolly
                                                                    Thomas G. Connolly (VA Bar No. 29164)
                                                                    HARRIS, WILTSHIRE & GRANNIS LLP
                                                                    1919 M Street NW, 8th Floor
                                                                    Washington, D.C. 20036
                                                                    Telephone: 202-730-1300
                                                                    tconnolly@hwglaw.com

                                                                    *Counsel for Plaintiffs*